# United States Navy–Marine Corps Court of Criminal Appeals

Before
HITESMAN, GASTON, and McCONNELL,
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Bailey C. ARNOLDT**
Lance Corporal (E-3), U.S. Marine Corps
Appellant

**No. 201800372**

Decided: 12 December 2019

Appeal from the United States Navy-Marine Corps Trial Judiciary. Military Judge: Colonel Matthew M. Kent, USMC (arraignment); Major Nathaniel Bonner, USMC (trial). Sentence adjudged 9 August 2018 by a special court-martial convened at Marine Corps Air Ground Combat Center, Twentynine Palms, California, consisting of officer and enlisted members. Sentence approved by the convening authority: reduction to E-1, forfeiture of two-thirds pay per month for 44 days, and a bad-conduct discharge.

For Appellant: Lieutenant Commander William Geraty, JAGC, USN

For Appellee: Lieutenant Joshua C. Fiveson, JAGC, USN; Lieutenant Kimberly Rios, JAGC, USN

_____

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

_____

PER CURIAM:

Appellant was convicted, contrary to her pleas, of one specification of wrongful use of cocaine under Article 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 912a (2012). The single issue presented is whether the evidence presented at trial is legally and factually sufficient to support Appellant's conviction.

We hold that the evidence is not factually sufficient where the Government's evidence relies solely upon the permissive inference associated with a positive urinalysis and the Urinalysis Program Coordinator (UPC) who testified at trial was not the UPC who supervised the collection and labeling of the tested specimen bottle.

## I. BACKGROUND

On 9 March 2018, the Commanding Officer of Combat Logistics Battalion 7 (CLB-7) ordered a unit wide urinalysis sweep. Since the CLB-7's regular UPC and urinalysis observers were subjects of the unit sweep, five UPCs and 15 urinalysis observers were borrowed from other units aboard Marine Corps Air Ground Combat Center Twentynine Palms.

The subject bottle containing the urine that tested positive for the cocaine metabolite was specimen (009) assigned with Batch #273 and corresponded to Appellant's Electronic Data Interchange Personal Identifier (EDIPI) number. At trial, the Government called Staff Sergeant RR who was the observer for the subject specimen. Staff Sergeant RR did not specifically remember Appellant, but testified as to her role as an observer during the urinalysis. In general, Staff Sergeant RR described what she does from the time she first begins supervising a subject Marine; through personal observation of the sample being provided; and culminating when she escorts the Marine back to the table where the UPC is located. In particular, she described the last step after leaving the head as follows: "I go back to the counter where the UPC is. The individual(s) set their sample down. The UPC will walk them through the rest of the process for labeling. At which point, I would locate this sheet [the "Testing Register" (Pros. Ex. 1)], sign them off, generally speaking . . . ." Staff Sergeant RR further testified that the Marine would sign the Testing Register (Pros. Ex. 1) sometime after she did. The evidence does not address whether she and the Marine signed the form contemporaneously, or whether the Marine executed the form sometime later under the supervision of the UPC.

The UPC who personally verified Appellant's identity and was responsible for ensuring the correct labels were applied to the correct specimen bottles did not testi-

fy.[1] Instead, the Government presented testimony from another UPC, Gunnery Sergeant CS, who participated in the same unit sweep on 9 March 2018. Gunnery Sergeant CS described the procedures that he followed during the urinalysis, to include asking the servicemembers to verify "their label" and place their initials on it before he placed the label on the bottle. Gunnery Sergeant CS also described the steps he took to ensure that the servicemembers maintained control over their specimen bottle with a finger placed on top of it when they return from the head.

On cross-examination, Gunnery Sergeant CS acknowledged that the "Urinalysis Brief Sheet" (Pros. Ex. 2), which specified the responsibilities of both observers and coordinators, *incorrectly listed him* as the coordinator for the batch that included Appellant's urine sample. Gunnery Sergeant CS further acknowledged that his initials were not on the label of Appellant's urine bottle. Instead, the initials on the bottle were K.R.C., which corresponded to a different UPC who was in charge of verifying the Appellant's identity and ensuring her specimen bottle was correctly labeled. Gunnery Sergeant CS confirmed on cross-examination, with respect to the subject bottle that "if that was a bottle from that particular testing, then, no, I did not touch the bottle or that label." A member submitted a question to Gunnery Sergeant CS asking, "Is that bottle Lance Corporal Arnoldt's exact bottle, or is it an example?" Gunnery Sergeant CS answered, "I couldn't tell you without verifying the registry with the EDIPI, which is not visible on this bottle."

The Urinalysis Brief Sheet (Pros. Ex. 2), states, "Urinalysis Coordinator / Observer responsibilities are set forth in MCO 5300.17 and [are] reemphasized below to ensure every urinalysis is handled with great care and positive control." According to the exhibit, the UPC (not the observer) is responsible for verifying the identity of each individual. The document assigns six responsibilities to the observer, none of which involve verifying the identity of the individual to be tested or for ensuring that the correct label is applied to the correct urine specimen bottle.

Staff Sergeant JS was also called by the Government and testified that he was responsible for gathering and shipping the urine samples provided during the 9 March 2018 urinalysis to the Navy Drug Screening Laboratory (NDSL). Staff Sergeant JS confirmed that he signed the chain-of-custody form. NDSL received a sample from Batch 0273 with Appellant's EDIPI number listed on the label. This sample also had initials on top of the bottle that matched Appellant's name. No discrepancies were noted for the subject bottle.

Over objection, Dr. DQ, an expert from NDSL, testified and explained both the chain-of-custody and testing procedures used by the NDSL. In sum, Dr. DQ testified

---

[1] The UPC that did process the Appellant's specimen bottle was on temporary duty at SERE school at the time of trial.

that the urine tested from the subject bottle tested positive for the metabolite of cocaine. The gas chromatography mass spectrometry (GCMS) test returned a result of 104 ng/ml for a metabolite of cocaine, which is above the Department of Defense cutoff level of 100 ng/ml.

Appellant presented two witnesses. First, Corporal DM, who had known Appellant for two-and-a-half years and did not socialize with her outside of work or on weekends, testified that he had not witnessed any manic, violent, or paranoid behavior by Appellant. He further testified that he had never seen Appellant possess cocaine or drug paraphernalia. The second witness, Lance Corporal AL, had only known Appellant for a month prior to the urinalysis (approximately 5 months by the time of trial) and did not socialize with her outside of the workplace. She testified that she had not witnessed any manic, violent, or paranoid behavior by Appellant. She also testified that although she was not really an expert, in her opinion the initials on the urinalysis bottle did not match Appellant's handwriting, which she was familiar with from having worked in the same section.

The parties also stipulated to the jurisdictional requirements; the fact that cocaine is a Schedule II controlled substance; and the fact that the Appellant was married and the mother of a one-year-old daughter at the time of the alleged offense.

## II. JURISDICTION AND STANDARD OF REVIEW

The Convening Authority approved a court-martial sentence that includes a punitive discharge, triggering Article 66(b)(1), UCMJ, jurisdiction. We are mandated to exercise a "unique statutory function" under Article 66(c), UCMJ. *United States v. Walters*, 58 M.M. 391, 395 (C.A.A.F. 2003). We must conduct a de novo review and may "affirm only such findings of guilty" as we find are "correct in law and fact." Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). This is an "awesome, plenary, de novo" power of review. *Walters*, 58 M.J. at 395 (citations omitted).

We review the legal sufficiency of the evidence by determining "whether, considering the evidence in the light most favorable to the prosecution, any reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Day*, 66 M.J. 172, 173-74 (C.A.A.F. 2008) (citations omitted). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the [service court of appeals] are themselves convinced of the accused's guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). We must take "a fresh, impartial look at the evidence," and we need not give "deference to the decision of the trial court . . . beyond the admonition in Article 66(c), UCMJ, to take into account the fact that the trial court saw and heard the witnesses." *Washington*, 57 M.J. at 399.

## III. LAW

> By "reasonable doubt" is not intended a fanciful or ingenious doubt or conjecture, but an honest, conscientious doubt suggested by the material evidence or lack of it in this case. . . . The proof must be such as to exclude not every hypothesis or possibility of innocence, but every fair and rational hypothesis except that of guilt

*United States v. Loving*, 41 M.J. 213, 281 (C.A.A.F. 1994) (affirming propriety of the military judge's definition of reasonable doubt).

To obtain a conviction under Article 112a for wrongful use of a controlled substance, the Government must prove:

> (a) That the accused used a controlled substance; and

> (b) That the use by the accused was wrongful.

To prove wrongful use, the Government must also demonstrate that Appellant had knowledge regarding the use of the controlled substance. This can be satisfied through an inference based on the "presence of the controlled substance in the accused's body or from other circumstantial evidence." MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.), Part IV, ¶ 37.c(1). *See also United States v. Green*, 55 M.J. 76 (C.A.A.F. 2001) ("A urinalysis . . . when accompanied by expert testimony [interpreting the test] . . . provides a legally sufficient basis . . . to draw the permissive inference of knowing, wrongful use."). In *United States v. Webb*, the Court of Appeals for the Armed Forces concluded that "if the evidence that an accused's body contained a controlled substance is based solely on a urinalysis, the Court must be convinced the urine specimen that was tested was the accused's." 66 M.J. 89, 93 (C.A.A.F. 2008).

## IV. DISCUSSION

Although we must take into account that we did not see or hear the witnesses, we are similarly situated with the members to evaluate whether not having the correct UPC testify at trial is sufficient to raise reasonable doubt in a permissive inference urinalysis case with no additional evidence of guilt.[2]

---

[2] Military servicemembers place a great deal of confidence in the urinalysis testing program; however, the methodology, while generally reliable, is still imperfect. This imperfection is highlighted in the context of a criminal trial where the burden on the government is proof beyond a reasonable doubt. For example, the evidence in this case revealed that the Navy Drug Screening Laboratory that tested the Appellant's specimen had been decertified as recently as the spring of 2017 for reporting three false positives. Thus, the permissive inference is just that—permissive.

There is a material lack of evidence when the actual UPC does not testify because the fact-finder does not know what he would say. For example, the actual UPC may have testified, consistent with how Gunnery Sergeant CS testified, that he was trained, experienced, and followed all of the applicable procedures. And had that occurred, we would have considerably less doubt that the correct label was applied to the correct subject specimen bottle to affirmatively connect the positive sample to Appellant. That did not happen in this case.

In comparison, the actual UPC might have testified to a lack of training and experience or that the collection environment was chaotic with many Marines being processed in a short period of time. His credibility, expertise, and/or biases could have been tested on cross-examination. The lack of evidence in this regard is significant in this urinalysis case, where the Government relies solely upon the permissive inference without additional evidence of guilt. Here, the Government presented essentially irrelevant testimony from a UPC who did not confirm Appellant's identy; did not ensure the proper bottle was labeled correctly; did not take custody of the specimen bottle; and could not testify to whether or not the proper procedures were followed at the time Appellant submitted her sample. In this case, the Government asks the fact-finder to fill this hole in the chain of custody by relying upon a combination of inferences drawn from the testimony of other witnesses. None of these witnesses had the responsibility to (a) ensure the identity of the Marine being tested; or (b) supervise to ensure the correct label was applied to the correct bottle.

Further, additional evidence presented at trial weighed in favor of Appellant and not in favor of guilt. This additional evidence included *inter alia*: (1) Appellant was married to an Army Sergeant and was the mother of a one-year-old daughter at the time of the alleged offense; (2) the UPC that did testify told the members that he couldn't tell the members if the bottle he was examining belonged to Appellant, "without verifying the registry with the EDIPI, which is not visible on this bottle"; and (3) that a Marine familiar with Appellant's handwriting opined that the initials on the bottle were not Appellant's handwriting. While this additional evidence standing alone, or even collectively, may not carry substantial weight, it is on the scale of justice in favor of Appellant and further spotlights that the Government did not have additional evidence to add to a permissive inference theory constructed upon an incomplete chain of custody.

## IV. CONCLUSION

In performing our duties under Article 66(c), UCMJ, we are not ruling as a matter of law that the actual UPC must be present at trial, or even that the facts in this case were *legally* insufficient. We do conclude that we have reasonable doubt under the facts of this urinalysis case, where the Government, relying solely upon the permissive inference without additional evidence, called the wrong UPC to testify at trial.

The guilty finding and sentence as to the sole Charge and Specification are **SET ASIDE** and **DISMISSED WITH PREJUDICE**.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court